## RICE et al. v. KANSAS CITY SOUTHERN RY. CO.

### No. 2082.

Court of Appeal of Louisiana. First Circuit.

March 4, 1940.

Pujo, Hardin & Porter, of Lake Charles, for appellants.

Chas. C. Jaubert, of Lake Charles, for appellee.

DORE, Judge.

This is a suit to recover damages for the alleged wrongful death of Robert Rice, who died from injuries received when struck by defendant's train while he was lying in a drunken stupor on defendant's railroad track in the City of DeQuincy, at about 1:25 A. M., July 2, 1938. The suit is brought by the decedent's widow on behalf of herself and their four minor children, one of the children being emancipated by marriage, though less than eighteen years of age.

The lower court rendered judgment in favor of the widow in her own right in the amount of $3,000, plus $1,500 on behalf of each of the three unemancipated minor children, plus $170 for the funeral expenses, and all costs of the suit.

The defendant has appealed, denying liability. Plaintiff has answered the appeal, setting forth that the award should be increased, and should include the minor child emancipated by marriage, but below eighteen years of age.

It is clearly shown that Robert Rice died from injuries received when he was run over by a water car being backed by an engine of the defendant railroad company on the main line of the company in the City of DeQuincy shortly after one o'clock A. M., on July 2, 1938, and that the deceased was lying in a drunken stupor beside the main line track with one or both feet across the east rail when the water car ran over him. It is also shown that the main line track whereon the accident occurred was customarily used as a footpath to the knowledge of the railroad employees; so that, at first glance, the case would appear to come within the well established rule in our jurisprudence to the effect that where a person lies down on the railroad track and, from sleep or intoxication, becomes unconscious of danger, and the locality where such person so places himself is in an urban section, or in a community where people frequently use the track as a footpath, much greater care is required on the part of train operators to keep a lookout for such person than where the locality is a rural section.

However, the defendant denies that the case comes within that rule, averring that the situs of the accident was within defendant's switching yard where trains and cars were being switched almost constantly, and that the deceased was a mere trespasser, familiar with the fact that the point at which he chose to lie down, drunk, across the rail of defendant's track, was highly dangerous. The defendant contends also that its cars were operated in a careful and prudent manner; that the brakeman on the water car was equipped with a light which was sufficient under ordinary conditions to discern any object on the track within time to stop; that the color of the clothes of the deceased blended with the ground and the grass within which he was lying to such extent that he was not discernible to the brakeman until the car was too close upon him to stop before striking him.

It appears, therefore, that the main points to be considered in arriving at a correct decision in the case are (1) whether or not the actual situs of the accident was within the switching area of the defendant's yard, and (2) whether or not the deceased was in such a position that he could not be seen by the train operators in time to avoid the accident. Of course, if the evidence shows that the point of accident was within the switching area of the defendant company, then the duty of the defendant to the deceased was merely not to wilfully and wantonly cause him injury. On the other hand, if the evidence shows that the point of the accident was not in the switching area, but on the main line track, used as a footpath, the defendant cannot escape liability except by showing that the train operators used the highest degree of care, and that the sole cause of the accident was that deceased was in such a position as to make it impossible for the operators to see him in time to avoid striking him.

From the map introduced by the defendant, it will be seen that the Kansas City Southern Railway main line enters the City of DeQuincy from the north, and upon reaching a point about 1,400 feet from the depot curves slightly to the southwest; that from that point there is a passing track on the southwest side of the main line which continues along the main line to a point beyond the depot, and on the southeast side there is a freight house track which runs for a distance of about 900 feet in a southwesterly direction from the point where the main line begins to curve along the said main line before meeting the main line at a point about 500 feet to the northeast of the depot.

The accident occurred at a point on the main line between the passing track and the freight house track, at a distance of 945 feet to the northeast of the center line of the depot, and at a distance of about 450 feet to the southwest of the point where the main line begins to curve.

The point of the accident, as observed by the trial judge, was not within the main switching area of the railroad, as claimed by defendant, as, according to the aforementioned map, the switching activities of the defendant railroad are done at a point several hundred feet southwest of the situs of the accident and apparently southwest of the depot. It will be observed from the map that after reaching a point some 600 feet from the point of the accident to the southwest, there is the main line nearest to the depot, and then a passing track, and then a switching track, all running southwesterly; and after reaching a point about 450 feet southwest of the depot, there are at least five switching tracks, and from a point about 400 feet southwest of the depot there is a curving switching track to the Lake Charles Branch line, about 850 feet to the east of the main line involved herein. It will be observed from the map, also, that about 550 feet southwest of the center line of the depot there is a "no trespassing" sign, which indicates further that the switching activities were to the southwest of the depot, a distance of some 1,495 feet from the situs of the accident.

■ From these considerations, and from the testimony, we cannot say that the lower court erred in finding that the place of the accident was on the main line track, customarily used as a footpath, and within an urban area, where the train operators should have been on the lookout for trespassers and should have proceeded with the highest degree of care in the operation of defendant's train.

As to whether or not proper care was used by the operators we find from the evidence that the water car, as it was being pushed backward, was traveling at a rate of about 6 or 8 miles per hour; that an employee of the defendant was standing on the car holding a standard electric lantern; that according to his testimony he could see a person or an animal in a standing position for a distance of some 200 or 300 feet ahead; that the car at the rate it was traveling could be stopped in an emergency within a distance estimated at from 45 to 60 feet; and that the deceased was lying prone on the

edge of the track, but that he was not hidden by grass, as claimed by defendant, or by any other object, nor does it appear that his clothing blended with the road bed in such manner as to make him imperceivable.

■ In view of these facts shown by the record, and since it is alleged by the defendant that the light used on the car was sufficient to make an object on the track discernible in time to make an emergency stop before striking it, we feel that the lower court committed no error in concluding that the train operators were guilty of negligence in failing to see the deceased lying on the track in an incapacitated condition in time to make an emergency stop before striking him, and that such negligence was the proximate cause of the accident and renders the defendant liable.

■ On the question of quantum of damages, the trial court found that the deceased was 47 years of age at the time of his death; that his widow was 51 years of age; that the three minor, unemancipated children were 18, 14 and 9 years of age, respectively; that the deceased at the time of his death was an irregular worker on the W. P. A. at a monthly rate of $26.52; that he had a small truck patch or garden where he and his family raised vegetables, and that he worked a little in digging small water wells; that the family lived in meagre circumstances; that in 1935 on a plea of guilty to a charge of desertion and non-support of his family he was given a suspended sentence conditioned on his furnishing bond assuring the payment to his wife of $3 per week; that he was a drunkard, and although he furnished a meagre support to his family, he fell below par in his obligations. We see no error in this finding of fact, but in the light of these facts we feel that the award below is excessive and should be reduced. It is our opinion that an award of $1,500 to the widow in her own right, and $750 to each of the three unemancipated, minor children, plus the funeral expenses of $170, plus costs, would be equitable in this case.

■ As to the claim of the minor emancipated by marriage, but under the age of eighteen years, a careful reading of our opinion in the case of Thornton et al. v. Central Surety & Insurance Corp., et al., La.App., 191 So. 179, together with the articles of the Civil Code on minors and their emancipation, will show that the reasons for holding that a minor emancipated by

marriage and over eighteen years of age should be considered as a major for the purpose of Article 2315 of the Civil Code, are applicable to a minor under eighteen years of age and emancipated by marriage. Like the minor over eighteen years of age and emancipated by marriage, the minor less than eighteen years of age and emancipated by marriage has the right to sue without the assistance of a tutor, may demand an accounting from his tutor, no longer can claim support of his parents and is no longer under their authority.

For the reasons assigned, the judgment below is amended by reducing the allowance to the widow in her own right to the sum of $1,500 and the allowance to the three unemancipated, minor children to the sum of $750 each, and as thus amended the judgment is affirmed, the costs of the appeal to be paid by the appellee.